# OLD PORT COVE PROPERTY OWNERS ASSOCIATION, INC. v DEPARTMENT OF ENVIRONMENTAL REGULATION and OLD PORT COVE INVESTMENTS, INC.

## Case No. 86-3927

State of Florida, Division of Administrative Hearings

May 20, 1987

### APPEARANCES OF COUNSEL

**Daniel S. Rosenbaum, Becker, Poliakoff and Streiter, P.A.,** for petitioner.

**Douglas Wyckoff,** Assistant General Counsel, for respondent, Department of Environmental Regulation.

**Robert A. Routa, Roberts, Egan and Routa, P.A.,** for respondent, Old Port Cove Investments, Inc.

### OPINION OF THE COURT

ARNOLD H. POLLOCK, Hearing Officer.

## RECOMMENDED ORDER

Consistent with the Notice of Hearing furnished the parties on November 17, 1986, a hearing was held before the undersigned in West Palm Beach, Florida, on March 3 -5, 1987. The issue for consideration was whether the Respondent, Old Port Cove Properties, Ltd., Inc., should be issued a permit by the Department of Environmental Regulation to expand its marina located in Old Port Cove community.

## BACKGROUND INFORMATION

On August 29, 1986, the Bureau of Permitting of the Department of Environmental Regulation, (DER), filed its Intent To Issue a dredge and fill permit to the Respondent, Old Port Cove Properties, Ltd., Inc. (Formerly Old Port Cove Investments, Inc.) (Applicant), for an additional 50 boat slips to its marina (North Marina) located in Lake Worth, North Palm Beach, Palm Beach County, Florida. Thereafter, the Petitioner, Old Port Cove Properties Owners Association, Inc., (Association), filed a Petition for Formal Hearing on September 12, 1986 contesting the award of this permit as intended by DER. On September 25, 1986, DER forwarded the file to the Director of the Division of Administrative Hearings requesting the appointment of a Hearing Officer and the undersigned set the case for hearing.

At the hearing, the Applicant presented the testimony of Mark Lavery, currently Marina Director of the Old Port Cove Marina; Richard Morgan, Manager of the Old Port Cove complex; Jacob H. Cooper, a civil engineer retained to design the sewage collection facility for the marina; Dr. John D. Wang, an expert in hydrodynamics; Dr. Paul R. McGinnes, an expert in the area of environmental chemistry and engineering; G. Jeffrey Churchill, an ecologist; and Dr. Martin Roessler, a marine scientist. Applicant also submitted for introduction Applicant's Exhibits 1 through 13.

Respondent DER introduced the testimony of Janet G. Llewellyn, an environmental supervisor with DER; and Dr. Kenneth L. Echternacht, an expert in hydrographic engineering, oceanography, meterology, and physical water quality impacts; and introduced DER Exhibits 1 through 8. Petitioner introduced the testimony of Margaret L. Singleton, James Smith, Joe D. Kelly, George Lucas, Jr., Arthur Yeckes, Herbert Charles, and Stanley W. Specker, all residents of Old Port Cove Complex; Janet Llewellyn, who testified for DER; Susan E. Chadderdon, office manager at Old Port Cove Marina; Mark S. Byers, an officer with the Florida Marine Patrol; Patrick M. Rose, Manatee and Marine Mammal Coordinator for the Department of Natural Resources; Dr. Daniel K. Odell, expert on manatees; and Clarence

159

Elroy Timmer, an expert in aquatic weed control, and introduced Association Exhibits 1 through 7.

The Hearing Officer heard the testimony of one individual, a resident at Old Port Cove Complex, who wished to give public comment.

Subsequent to the hearing, the parties submitted Proposed Recommended Orders containing proposed findings of fact which have been treated in the Appendix attached hereto. It is noted that Petitioner's Proposed Recommended Order fails to make any citations to the transcript filed in this case in violation of Rule 22I-6.031, *Florida Administrative Code.* Respondent Department of Environmental Regulation has, therefore moved that Petitioner's Proposed Recommended Order be stricken and that its Petition filed herein be dismissed because it failed to produce any evidence to show standing. Having considered the testimony presented at the hearing and although the Rule in question does call for citations to the transcript, it would be patently unfair to strike an entire Proposed Recommended Order because it does not contain such citations. Consequently, the Motion to Strike is hereby denied as is the Motion to Dismiss on lack of standing.

## FINDINGS OF FACT

1. Petitioner, the Association, represents 1,053 condominium homeowners located in the Old Port Cove Community, a residential development in Palm Beach County, Florida. Old Port Cove Community consists of seven separate condominium buildings and associations. Many of the individual condominium homes/apartments within the complex border on and overlook the Old Port Cove area of north Lake Worth which is the location of the two existing marinas operated by the Respondent Applicant and the site of the proposed marina expansion.

2. The water in question is an essential part of the residential community and was, in many cases, a major factor considered by the homeowners purchasing in this community. At the time of development, going back a minimum of seven years, property owners were advised by the developer/Applicant (or its predecessor) that the marinas constructed or to be constructed would be for the exclusive use of the residents of the condominium apartment houses within the complex.

3. On or about March 12, 1986, Respondent, DER, received an application from the Applicant for a dredge and fill permit for the construction of a commercial addition to the northernmost marina currently existing at Old Port Cove Complex. The new construction

160

was to consist of 1 pier of a total length of 911 feet with 50 boat slips and 26 finger piers. The new slips will be 45 feet in length of which 15 feet will consist of pier and the remaining 30 feet of open water terminated by a piling. The main pier would extend in a northeast direction from the easternmost point of the existing north pier for a total of 171 feet, then turn northwest for a total of 490 feet, and then turn southwest for an additional 250 feet to enclose an area of water leaving a 90 foot wide space for entry of boats into the enclosed area. The application for the permit contains as an attachment thereto an engineering drawing depicting the proposed marina expansion and its relationship to the existing marina.

4. This expansion was proposed because of the growing need for boat slips in the area. The operator, currently providing a total of 289 slips in both marinas, (197 in the south and 92 in the north) proposes to construct 50 new slips for pleasure boats from 25 to 120 feet in length. Applicant proposes and commits itself to utilize the new slips for sailboats only.

5. Notwithstanding the fact that there are approximately 1,261 additional slips available within a one mile area of the proposed site, the applicant contends it has been continuously turning away applicants for slip rentals in its facilities. If approved, the proposed new facility will constitute an approximate 4% increase in the total number of boat slips in the area, not counting the free moorings offshort in the Federal mooring in the center of the cove.

6. Applicant presently operates one diesel fuel pump at the South Marina. No other fueling facilities exist at either marina operated by Applicant nor are any additional fueling facilities intended. Applicant has also entered into a contract with a local fuel spill control company to provide spill cleanup if necessary. At the present time, there are no pump-out stations for sewage at either the North or South Marina. Applicant proposes to install sewage facilities as a part of the approval package. Leasing agreements currently in effect require all boats using the marinas to certify they have U.S. Coast Guard approved heads on board before being allowed to dock at the marina. This requirement is not actively enforced, however.

7. Most boats utilizing the facility are pleasure/noncommercial fishing boats. Individuals, mainly residents of the apartment complex, use the docks for fishing but there is some question as to the nature and availability of the fish population in the area.

8. Manatees do frequent the area, however, not necessarily as far north as the marina in any great numbers, but several hundred yards

**161**

to the south, congregating at times around the entrance to the intra-coastal waterway which forks off to the northeast somewhat south of the south marina.

9. Subsequent to the receipt of the Association's Petition herein, DER had numerous water quality tests performed and requested certain assurances from the Applicant designed to remedy or rectify numerous objections made by the Association in its Petition. Thereafter, on February 16, 1987, DER issued a Revised Intent to Issue in this case in which it addressed the Association's concerns and specified certain conditions to be included in the permit to protect the water quality and biological resources in the project area. These conditions included:

a. A prohibition against commencement of any excavation or other construction activity prior to receipt of evidence of permission from the Trustees of the Internal Improvement Trust Fund or DNR;

b. A requirement for notification of the Division of Archives in the event any historical or archaeological artifacts are discovered within the project site;

c. Provision for permanent sewage pump-out facilities to be provided at the south marina to replace portable facilities currently available, within 90 days of permit issuance, and the provision of temporary sewage pump-out facilities at the north marina which shall be in place and functioning prior to any work being commenced under the permit;

d. The requirement for use of turbidity screens around the project site during construction to remain in place until turbidity behind the screens falls to an acceptable level;

e. The placing of educational signs, the content of which shall be coordinated with DNR, at both the north and south marinas, informing boats that manatee may be in the area and requesting that care be taken;

f. The posting of manatee warning signs in both marinas;

g. The establishment of idle speed and no wake zones in both marinas and the access channels;

h. A provision that permanent liveaboards connect their vessels with permanent sewage hook-ups at all times when the vessel is docked; and

i. A provision against refueling facilities at the expanded north marina.

10. Applicant and DER are satisfied that the conditions imposed by the terms of the Revised Intent to Issue satisfy all the current requirements of the statute and rules relevant to dredge and fill permits for projects of this nature.

162

11. Many of the apartment owners, banding together as the Petitioner Association herein, strongly resist approval of the permit to construct the new marina for numerous reasons. They contend, first, that the construction of the new marina and the greater number of boats resulting therefrom, constitute a threat to the manatee population in the area. The Association is also concerned with water qualify in the area, fire safety, wake damage, and noise pollution as a result of the proposal. Other considerations of the residents include parking and a diminishment in the resale value of their property. Several of the residents have seen manatee in the area swimming in the waters adjacent to the marina and in the "key" area on the other side of the peninsula. Many have scars on them and appear to have been injured by collisions with boats. Several residents have seen trash and debris in the water and have observed boats traveling at a high rate of speed just outside the existing marinas.

12. In addition to debris, residents have seen oil and grease floating on the water and contend that the proposed wave baffles hanging down into the water from the extended pier will interfere with the natural flushing action of the winds and tides. Many of these same individuals complain of an extremely bad odor coming from the marina and they have observed boat owners either pumping their bilges directly into the marina water or washing their boats with detergents which are allowed to run overboard into the water.

13. At least one resident, speaking for others as well, referred to a green space, an area of grass outside and between the buildings and the water. Originally, this area was supposed to be gardens and a recreational area for the residential complex, and the yacht club was to be a secondary appurtenance for the property owners. Now, with apartment owners making up no more than 10% of the occupants of the marina slips, it seems as though the apartment residence owners are being shunted to the background and commercial activities, including the marina, are becoming paramount in the eyes of the applicant which still operates it. This green space is now proposed to be converted by the applicant to parking for the use of the marina patrons; all to the detriment of the apartment owners.

14. There is some evidence that boat owners utilize the grounds of the apartment complex as a place to walk their dogs for canine toilet purposes and there is some evidence that numerous liveaboard boat owners, who do not have adequate toilet and bathing facilities on board their boats, utilize the pool, showers, and toilets ordinarily reserved for residents of the apartment complex. Noise from parties on the boats is

**163**

often both excessive and disturbing and to the knowledge of at least some of those testifying on behalf of the Association, efforts by security personnel employed by the condominium associations to get the boat owners to curb the noise and disruption have been totally unsuccessful. One resident summed up the feelings of his co-owners when he indicated that these various factors translate to property value and because of the current situation with pollution, noise, lack of security, and the increasing commercialism, the result has been a substantial drop in property value. This witness feels that the more slips that are made available, along with their related annoyances, the less the value of the individual apartments will be. All feel that the addition of 50 more slips will increase the existing problems and none of the residents who testified for the association were of the opinion that the developer's controls will be adequate to alleviate or minimize the untenable situation which they now face. However, there was no evidence presented to substantiate the layman opinion of reduction in property value and it cannot be said, therefore, that this has or will really happen, and the amount of loss.

15. Turning to the issue of water quality as effected by refueling operations and sewage disposal at the marina, the question of fueling facilities was not raised by the Association other than to˙object basically because of the potential for fuel spills. Applicant and DER contend that this problem should be taken care of through the contracting for the services of Glasgow Equipment Services, providing for 24 hour emergency response for fuel spills of any type. It is unreasonable to expect that a marina providing dockage for potentially as many as 289 motor vessels can be expected to be totally spill free. If proper refueling procedures are followed, and there is no evidence to indicate that they would not be, the incident of fuel spills should be minimal and the contract with the clean-up service providing for around the clock response in case of a spill, appears to be adequate action to remedy the effects of any spill. There have been very few fuel spills in the history of the marina operation. The most recent resulted in a spill of no more than 3 to 5 gallons and clean-up was successfully accomplished with little damage. The Association made much of the fact that no disciplinary action was taken against the offender and that the boat in question is still an occupant of the marina. This incident is still under investigation, however, and final action has not yet been taken.

16. At the current time, there are no pump-out stations for sewage at either the north or south marina. The applicants propose to install a pump-out sewage facility tied to each vessel berth in the south marina

164

and to provide a portable pumpout facility which can be rolled to a particular spot to meet the needs of any vessel at the north marina. The Applicant has agreed to fund the project completely and has agreed to the special conditions contained in the Revised Intend to Issue regarding the pumping stations.

17. Applicant and DER both arranged for testing of the water quality at the north marina to determine the current condition of the water. Dr. John D. Wang, an expert in coastal hydrodynamics on the faculty at the University of Miami, is familiar with the site of the proposed expansion and visited it last in November, 1986. At that time, he did a study on the flow exchange caused by tides and wind over a two day period. As a part of his test, he placed instruments in the water to take measurements of water motion, temperature, and salinity on the outer side of the current pier at the north marina and inside that marina at different depths. On the first day of the test, the tide was an ebb tide (receding) pulling water out of the marina area. However, at the same time, the wind was from the southeast which directly opposed the tide action. At the surface, the drouges (instruments) followed the wind. Those deeper in the water went with the tide. When the tide came in the next day, the drogues went to the north under the power of both wind and tide.

18. Dr. Wang's experiment confirmed not only that the water moved in and out of the marina area, but also that the water circulated clockwise north along the west side of Lake Worth and south on eastern side. Dr. Wang thought this might be due to wind force, but regardless of the cause, it was a good indication that water was exchanged in the area. Dr. Wang concluded that the water in the marina was completely taken out within one hour and joined the circulatory pattern, being replaced by other water. The baffles placed on the piers to reduce wave motion will have some effect on the water circulation tending to reduce surface flow, but these baffles will not prevent the exchange of water due to circulation because they are limited to the top three feet of the water. In Dr. Wang's opinion, they may have some positive effect on circulation by prevent wave water from flowing back out. By the same token, the presence of boats in the marina will have but a marginal effect on water exchange. The draft of the boats utilizing this area is not much more than the wave baffles and there will still be ample water underneath to permit flow and exchange. In fact, in Dr. Wang's opinion, the location of this marina is almost optimal. By virtue of the fact that it is out in the open, water can flow freely through the area and no dredging is required. The flat, sloping bottom promotes water exchange. No evidence was presented to contradict this opinion and it is hereby accepted.

19. Additional tests on water quality were run by Dr. Paul R. McGinnes, head of an independent consultant laboratory specializing in water quality and motion who visited the site several times doing three separate studies of dissolved oxygen, salinity, and water temperature at various depths and at different hours. As a part of his examination, he also looked for oil (pollutants), and bacterial components.

20. The water subject to tests for bacterial components was taken from the top foot at several locations in each of the three studies. In the 1983 study, tests showed fecal and coliform bacteria were present in sufficient quantities to constitute a few violations. In 1986, when he sampled for fecal bacteria only, the count was very low. In the 1987 test of samples taken twenty times over 24 hours, the fecal bacteria count was, in each case, within state limits.

21. As to heavy metals, in 1983, levels of lead, cadmium, mercury, and zinc were not present. There was no evidence as to current levels. As to oils and greases, all studies showed very little present (below 5mg per litre) and what grease was there could consist of animal or vegetable fats. This is considered unlikely and it is found there is petroleum product in the water, though in insignificant quantities.

22. Regarding dissolved oxygen, all tests showed compliance with state standards. Levels were comparable to other areas of Lake Worth.

23. Dr. McGinnes is generally familiar with the state standards for Class III waters and believes the construction and operation of the new 50 slips at the north marina will in no way result in violation of state water quality standards. His opinion as to this construction is based on his tests, his conversations with applicant's personnel, and his experience with other similar projects. Granted, boats do tend to leak oil and that situation will raise the oil level in the immediate area of the leak. However, not all boats leak in all marinas and what leaks there are will tend to dissipate to a safe level within a very short period of time.

24. In February, 1983, the coliform bacteria in the south marina were higher than in the north marina or in Lake Worth in general. However, coliform bacteria does not appear to be a major problem in this case. In response to cross examination, Dr. McGinnes concluded that even if five boats dumped raw sewage in the north marina, it would not have any major negative impact on the overall water quality there. It would, of course, affect the same taken in the area immediately after dumping, but not the overall quality over the long run.

25. Dr. McGinnes' last sample was taken in February, 1987, which is a time of highest use. The water quality in and around the marina is

166

generally as good as in the northern end of Lake Worth which is better than in the southern end of the lake. His examination of the water quality indicated no recognized violations of Florida water quality standards in the last two reports.

26. The association's expert, Mr. Timmer, went to Old Port Cove in January, 1987 and saw numerous boats in the slips. He looked for inlets opening into the marina and for a bird population, either one of which could cause an increase in undesirable bacteria in the area. He found none. He took water samples for testing to see if the fecal coliform bacteria level in the marina was higher than outside it. During his tests, he took samples from 14 sites at three separate depths at each. His samples were duplicated for safety in case any one sample was compromised. Six of his samples were taken inside the dock area of the north marina; one was taken to the north several thousand yards; and four more were taken outside the area of the proposed marina. One was taken in the federal anchorage; several across the cove on the east side of the lake; and one outside the cove, south of the Intracoastal Waterway inlet and west of the channel. The furthest test site was approximately one mile from the marina.

27. When Mr. Timmer got his samples, he isolated the sets from each other; "refrigerated" them (placing them in a cooler without any ice), and upon completion of his sampling, took them to the McGinnes lab where analyses were done for fecal coliform bacteria. As a result of his tests, and relying on the report received from McGinnes Laboratories, Mr. Timmer concluded that the fecal coliform level within the marina was higher than outside the marina by 5 to 10 times. Surface samples, he felt, averaged out in excess of what he considered to be the state standard. Some of the lower level samples were high also. In no case, however, did any sample exceed a count of 15 outside the marina.

28. Coliform standards, according to state rules, are to be averaged over a month's period of taking. In fact, the report received from, the McGinnes lab concluded that because testing was not done over a month's period, the standard was not exceeded. These samples, even that one reflecting a reading of 560 bacteria per 100 ml at site 3a, did not come anywhere near the upper limits of the state standard and in fact was well within it.

29. Mr. Churchill, a zoologist and ecologist and expert in marine biology made various studies of the benthic communities and fish population in the area of the proposed construction. He studied the soft bottom communities and took samples of the bottom in different areas both inside and outside the current marina and in the area where

the extension is proposed. He found that the outside and the outer inside communities were much the same and had a low number of species. The inner inside was considerably different. It had a higher number of both species and individuals. A larger number is a better system and DER rules provide that one cannot build a project which would tend the reduce the number. Here, since the area where the construction is planned is outside the area of high species count and similar to the rest of the cove area, the construction would most likely not violate the state's rule. In fact, in Mr. Churchill's opinion, concurred in by other experts, the proposed project will, rather than negatively impact the environment for wildlife, enhance it by providing additional habitat. The pilings, forming supports for the piers and ties for the boats will provide habitat for small marine life which in turn provide food for larger life which is attracted. This testimony would tend to contradict the testimony of at least one of the residents who indicated that in his experience, the fish population in the area had declined radically over the years since he moved in and that about all one can catch in the immediate area now are small small sheepshead. This is in comparison to the larger variety and size of fish available to the angler several years in the past. No doubt, the fish selection and availability has diminished since the area was developed, but the question is whether the new construction will aggravate that situation and the answers appears to be that it will not.

30. An additional water quality study was conducted by Dr. Martin Roessler, a marine scientist who did a water quality study in the area consistent with that done by Dr. McGinnes. He also did several of his own on-site inspections as to water clarity and marine plant and other life including reptiles and birds in the area. On his third visit to the site, he took water quality samples for testing for bacteria and other marine life.

31. As a result of his tests, he concluded that water quality in the area should not be diminished by construction of the marina. During construction, the use of turbidity curtains and booms will tend to keep any temporary disruption to a minimum. He agrees with Dr. McGinnes and Mr. Churchill that the nature of marine life within the area should not be disturbed by the construction. He was unable to observe any sea grasses in the area (they are on the other side of the cove and not where he observed) and dredging would not be involved; only the driving of pilings which will disrupt the bottom only in the immediate area of the piling. Dr. Roessler's credibility was not damaged by the Association's evidence that a previous study done for another agency was rejected and he was not paid for the work done. There was

168

insufficient evidence of detail and a broad-brush smear can not be held effective here.

32. When Old Port Cove submitted its application for its permit, it included the original draft and all requested information in a final product. This project documentation was evaluated by Ms. Janet Llewellyn, a supervisor with DER, who is an individual fully conversant and familiar with the dredge and fill rules and standards set forth in the statutes and the F.A.C.

33. As to water quality, Ms. Llewellyn analyzed the information submitted by the applicant in response to her request for water samples at certain locations she had identified. These samples showed no current violation of the rules governing dissolved oxygen and fecal or coliform bacteria even with the boats that are currently in the marina. DER also requested hydrographic information as a part of the "reasonable assurance" test and this information was to deal with existing water quality and the flushing action of the tides and winds.

34. Ms. Llewellyn has visited the site, albeit only shortly before the hearing, and as a result believes that the drawings submitted with the permit application are correct and represent the work to be done accurately. Recognizing that the field inspection report submitted by on-scene local DER personnel is somewhat negative in its evaluation of the project, she nonetheless, disagrees with certain portions of this report which say that boats and piers will interfere with the flushing action of the wind and tide. She also disagrees with the statement that oil and grease will continue to degrade water quality. She feels that the inspector who did the report did not have available to him the hydrographic and water quality tests that she had. This information, submitted somewhat earlier, was sent to Tallahassee by the experts and was not forwarded to the field representative when the request for the survey was laid on.

35. The Revised Intent to Issue, including as it does, the additional requirements laid on the applicant in such areas as sewage pump-out, liveaboards, fueling facility prohibitions, and the like came about as a result of misunderstandings between DER and the applicant and culminated in the applicant agreeing to try to ameliorate the situation and the issuance of the permit by compromise as suggested. DER is satisfied with the proposals contained in the Revised Intent to Issue and feels that approval of this permit will upgrade the facilities at the south marina as well as insure compliance with state water quality standards at the north marina. Together it will result in an upgrade in the water quality in the area. Ms. Llewellyn is convinced that there

169

will be no negative effects on the water quality by the construction at the north marina and that the criteria contained in both the statutes and the rules, from an environmental standpoint, will not be violated. DER has no authority to consider other factors which appear to be among the most substantial complaints of the association members. She did not consider the possibility of damage to the scenic view by the addition because she did not consider it to be an issue. In her opinion, the question of damage to the property of others relates to damage to structure, property, wildlife, etc., and the impacts to these would be negligible. What she considers important is that the permit involved here is for construction, not operation of the marina and enforcement of continuing operational rules is another consideration entirely.

36. When using the term "assurance" as a requirement for an applicant, the assurance required is not that the new slips will have *no* adverse impact, but that any adverse impact will not reduce the water quality below standards set out in the statutes and rules. Though not envisioned, water quality can be reduced from very high quality to high quality (a reduction in quality) and still be within standards.

37. Additional scientific examination of the water and the immediate site was conducted by Dr. Kenneth L. Echternacht, a hydrographic engineer, physicist, and physical water quality expert with DER who reviewed the hydrographic study submitted with the application. He found that the drogue study showed water speeds of between .05 to .1 feet per second which was typical of the area. The placing of drogues and the resultant study and conclusions was not flawed by the lack of education of the individual who did the placing at the direction of the scientist. What is important is the education and knowledge of the supervising scientist who will take the information gathered and examine it.

38. Considering that prevailing winds in this area during daylight hours are from the sea to the land (SE to NW), and at night the reverse occurs, any study made only during daylight or during night-time would be flawed to the extent that it would examine only one part of the equation.

39. Given the baseline information available to him, Dr. Echternacht concluded the project as described would not adversely effect water quality from a hydrographic standpoint. Flushing and circulation are important to water quality. If the water does not move, the pollutants added by outside factors, (here boats), accumulate and build up. On the other hand, the faster the water moves, mixed with turbulence, the faster the pollutant is disbursed and prevented from accumulating.

40. At .05 f/sec, a particle of water would move 180 feet per hour. As a result, water will move the length of the marina, (450') in 2 ½ hours. Therefore, if a spill occurred at the south boundary during an incoming tide, it would move to the north boundary of the marine within 2 ½ hours and given a tide cycle of 6 ½ hours, would still have 3 ½ to 4 hours to move even further away, mix with other water, and be disbursed before being brought back to the marine by the outgoing tide. (However, there is evidence that the water moves in a clockwise direction and the likelihood is great that the contaminated water would not even come back to the marine but would head out down the eastern side of the cove.) This is a worst case situation because of the slow water movement rate utilized and it is, itself, a relatively fast movement. Admittedly, this water movement will be affected by obstacles in the water such as boat hulls, posts, pilings, and baffles. However, while these factors would slow up the water, they would also create turbulence and vortices in the water which, themselves, help mixing. From a practical standpoint, other factors are involved such as the size of the obstacle, etc.

41. Here we are faced with a situation where the marina is not enclosed and the water flows freely. The water quality can be expected to be better than in an enclosed marina and even better in the new area than in the existing areas because it will be further away from the seawall.

42. Taken together, in light of the evidence presented by both sides, it is found that a diminishment in water quality as a result of the construction of the proposed facility here would be minimal and would in no case, likely result in a reduction of the water quality to a level below that considered acceptable in the state statutes and rules.

43. In addition to water quality, the residents were concerned about the threat of injury to the manatee population which, while not appearing in the immediate area of the proposed construction on a regular basis, does visit the area periodically. In addition, there is substantial evidence to establish that boats coming into and out of the marina, going down through the channel into the main part of Lake Worth and out through the cut, would pass through areas actively populated and visited by manatees and therefore, the opening of 50 additional slips for new boats, even in this less populated area, could have a substantial impact on the manatee population.

44. There is no doubt that manatees do visit the area. There are sea grasses, if not in the immediate area of the proposed marina, certainly on the opposite short of the north part of Lake Worth. It is uncontro-

171

verted as well that manatees have been seen near the marina and in the key area on the other side of the peninsula. However, the evidence introduced by the association's own witnesses, Mr. Rose and Dr. Odell, indicates that the manatee population tends to congregate in areas south of the entrance to the Intracoastal Waterway which, itself, is south of the Old Port Cove area.

45. Many manatee congregate in the warm waters produced by the Riviera Beach power plant in the southern part of Lake Worth and go from there to other areas within the Lake Worth area to feed, even as far north as Hobe Sound and Loxahatchee. Generally, there are not enough sea grasses in the local area to keep them there.

46. Manatees can range up to 12 feet in length and up to 3500 pounds in weight. Manatee death in Palm Beach County, of which boat deaths account for approximately 50 percent, are a serious danger to the survival of the manatee population. The greatest danger to manatees comes from power boats. While there is no evidence that sailboats are dangerous since they move slowly enough for the manatee normally to evade them, there nonetheless may be some danger as a result of their presence. Some manatees are crushed by barges and larger power boats. Some are killed by impact with medium and larger boats. In approximately 40 percent of the cases, impact kills without propeller injuries and it is hard to tell the size of the boat which did the damage. As to propeller deaths, boats from 24 feet up can kill by this method. The number of manatee deaths has increased lately as a result of boat and other man related causes and if this trend continues, the manatee population will decline and, possibly, become extinct.

47. Mr. Rose, who is quite familiar with the habits of the manatee in this area, states that it is most likely that in traveling north to Hobe Sound and environs, the manatee would travel up the Intracoastal Waterway (the entrance to which is south of the proposed construction) and not go into the Old Port Cove area. Even if they were following the grass which runs along the east and north shores of Old Port Cove, the grass does not grow on the marina side and it is unlikely the manatees would come to the marina in the west to feed though they might come for other reasons and in fact have been seen in the "key" area.

48. Dr. Odell, perhaps the foremost authority on manatee in the United States, has visited the area and, at this hearing, heard the testimony of the other witnesses. He contends that because of the food available in the form of sea grasses and mangrove seeds, primarily on the eastern side of the cove, the likelihood is that manatees would be

172

found in that area. This is consistent with the testimony of Mr. Rose. Consequently, it is found that while manatees come to the area of the proposed marina from time to time, it is more the stray manatee than evidence of continued habitat.

49. Dr. Odell's studies indicate that between 1974 and 1985, there were no manatee deaths recorded in north Lake Worth. However, it is possible that the dead manatee found elsewhere may have been injured or even died elsewhere, (possibly near Old Port Cove) and there well may have been others who were injured in the area who went elsewhere to die. There is, however, no evidence that this is the case.

50. Dr. Odell considers that boats with a draft of between 5 and 7 feet would leave little clearance from the bottom in the bottleneck area south of the marina where the water depth is no more than 9 or 10 feet, to allow room for the manatee to avoid them. In fact, he feels that large, inboard powered boats pose the greatest threat to the manatee. While sailboats generally do not create a risk to the mammal, if the new 50 slips were to be limited to sailboats but existing slips were to be converted to power boats, this would constitute a severe threat to the manatee population. Further, a change in use patterns, creating more traffic, would increase the risk to the manatee. The real issue is, however, how much time boats spend in manatee habitats. The more boats there are, the less desirable the situation. (Both experts agree, however that if the 50 new slips are limited to sailboats and the ratio of power boats to sailboats in the existing slips is not increased, there is really no legitimate reason, based on a threat to the manatee population, to deny this construction permit.) It would appear, then, that the risk to the manatee population is acceptable.

51. Signs advising boaters to slow down and beware of manatee are good only so long as they promote awareness. There is, according to Dr. Odell, no evidence that they have reduced manatee mortality and given present trends of more power boats and the destruction of the manatee's habitat, one can expect the manatee population to decrease even further.

## CONCLUSIONS OF LAW

The Division of Administrative Hearings has jurisdiction over the parties and subject matter in this case. Section 120.57(1), *Florida Statutes.*

Guidelines controlling the issuance of dredge and fill permits are contained in the provisions of *Florida Statutes,* and the Florida Administrative Code.

**173**

DER has permitting jurisdiction in this case over dredge and fill activities in Lake Worth which is classified as waters of the state under Section 403.918, *Florida Statutes,* which states:

(1) A permit may not be issued . . . unless the applicant provides the department with reasonable assurances that water quality standards will not be violated. . . .

(2) A permit may not be issued . . . unless the applicant provides the department with reasonable assurances that the project is not contrary to the public interest. . . .

(a) In determining whether a project is not contrary to the public interest, or is clearly in the public interest, the department shall consider and balance the following criteria:

1. Whether the project will adversely affect the public health safety or welfare of the property of others;

2. Whether the project will adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats;

3. Whether the project will adversely affect navigation or the flow of water or cause harmful erosion or shoaling;

4. Whether the project will adversely affect the fishing or recreational values or marine productivity in the vicinity of the project;

5. Whether the project will be of a temporary or permanent nature;

6. Whether the project will adversely affect or will enhance significant historical and archaeological resources . . .; and

7. The current conditions and relative value of functions being performed by areas affected by the proposed activity.

The statute also states that if the applicant is unable to otherwise meet the criteria set forth in the above subsections, the department shall consider measures proposed by or acceptable to the applicant to mitigate adverse effects which may be caused by the project. If the applicant is unable to meet water quality standards, the department shall consider mitigation measures proposed by or acceptable to the applicant that cause net improvement of the water quality.

From the above, it can readily be seen that the test imposed by the statute is not the creation of pristine water quality or even necessarily the maintenance of the status quo, but that the activity not cause a deterioration in water quality below the reasonable standards set by the rules in accordance with the statutory authority given the department.

There can be little doubt that this proposed project is totally

174

unacceptable to many of the residents and apartment owners in the condominium apartment houses which border on and overlook it. To be sure, there is some evidence, though hearsay at best, that at the time of development of this area and the initial purchase of the apartments, the prospective apartment purchasers were advised that the marina complex was to be for their use and benefit. Though there may have been no definitive statement that the public would be unwelcome, at least the implication was that the apartment residents would be the beneficiaries of this operation. Evidence does show that these representations by the developer were not fulfilled and it is clear that at the present time, by far the majority of boat slips in both marinas are occupied and utilized by nonresidents of the apartment complex. It is most likely that the new slips will also be so used.

There can also be no doubt that the use of the marinas by the public creates a substantial nuisance to the apartment owners and in many cases, interferes, with their enjoyment of their apartments. There is, for example, evidence that outside marina patrons utilize some of the facilities initially developed for the use and benefit of the apartment dwellers. There is also some evidence that parking has become a definite problem and the residents' parking spaces are often being improperly occupied by marina patrons and their guests. There is evidence that some contamination of the water by oil and grase and detergents from the boats has occurred as well as, undoubtedly, some pollution of the water through the escape of sewage from these same boats. Noise from the activities of the liveaboards has been and continues to be a substantial irritant to the apartment residents. In short, the residents feel that they have been abused; that their quiet enjoyment of their property has been diminished; and that the value of their apartments has been reduced by the operation of the existing boat slips in both the north and south marinas. It is because of these factors that they resist the increase of slips in the north marina which they fell will compound the already existing untenable situation.

This alleged unfavorable effect on their property, if established, would fall within the parameters of the criteria number 1 referenced above as an adverse effect on the property of others. Here, the association membership contends that their property use has been so restricted that they cannot enjoy the life that they envisioned in their apartments at the time of purchase. In that regard, they cite the definition of pollution found at Section 403.031(7), *Florida Statutes,* which defined pollution as:

> . . . the presence in the outdoor atmosphere or waters of the state of any substances, contaminants, noise, or manmade or man-induced

**175**

alteration of the chemical, physical, biological, or radiological integrity of air or waters in quantities or at levels which are or may be potentially harmful or injurious to human health or welfare, animal or plant life, or property or which unreasonable interfere with the enjoyment of life or property, including outdoor recreation.

Here, the association members have indicated that they can no longer enjoy their property by virtue of the noise and the smell and contamination brought about by the existence of the current marinas. This evidence, sincere as it is, demonstrates no more than an annoyance and it cannot be said that this annoyance, while perhaps actionable in some other forum, is sufficiently grievous to constitute an unreasonable interference with the enjoyment of their property or which interferes unreasonably with their outdoor recreational activities. There was no evidence presented at this hearing to indicate that the noise or pollution is or may be potentially harmful or injurious to human health or welfare, or animal or plant life.

Turning then to the criteria set out in Section 403.918, the evidence, notwithstanding strong protestations by the association, establishes beyond doubt that water quality standards, as outlined in Rule 17-3.121, F.A.C. would not be adversely affected or violated by the additional construction envisioned under the proposed permit. In arriving at this conclusion, substantial consideration was given to the testimony of the association's expert which was weighed against the testimony of the applicant's experts, including that "flawed" testimony of Dr. Roessler. Considering the evidence as a whole, one must come to the inescapable conclusion that the applicant has satisfied its burden of establishing reasonable assurances that water quality standards will not be violated.

With regard to the public interest test, one must turn and examine the evidence in light of the seven criteria listed under Section 403.918(2)(a)1-7. Treating each individually, it is clear that the applicant has given reasonable assurances that the project will not adversely affect the public the public health, safety or welfare, and that the adverse effect on the property of others, as discussed above, relates to their enjoyment of their property and not to any physical effect. The association attempted to show that the value of the individual apartments has been adversely affected and declined since the marina has become more a public operation than one reserved for the apartment residents. It well may be that this is so, but the testimony of one apartment owner to the general conclusion that his property has declined in value, absent any other direct evidence regarding a decline

176

in dollar value, does not sufficient establish a legitimate issue regarding an adverse effect on the property as is called for in these criteria.

Further, the evidence presented by the applicant, notwithstanding the testimony of several residents that their individual fishing success has diminished substantially over the years as a result of the reduction in water quality, tends to indicate that not only will the fish population not be adversely affected but in fact is likely to increase due to the increased availability of food sources on the pilings and baffles which will extend into the water as a result of the construction. The major wildlife consideration here relates, however, to the manatee and while there is no doubt that any increase in boat traffic may pose some threat to the manatee population, an already threatened species, here even the association's witnesses indicated that if the new sips were reserved for sailboats only and there was no change in the ratio between sail and power boats in the existing slips, the effect on the manatee as a result of the new slips would not be sufficiently grievous to cause them to recommend against the construction. As to the habitat, clearly there would be no danger to manatee habitats as a result of this project.

The next issue is whether the project will adversely affect navigation or the flow of water. The evidence presented by the applicant establishes that the construction will not extend out into the channel and will in no way affect navigation or the flow of water would relate to the flow of water through the marina area and would be significant only as it relates to the flushing action of the wind and tides to avoid pollution in the area. There is no evidence that any harmful erosion or soaling would occur as a result of this project.

Turning to the effect of the project on fishing or recreational values or marine productivity in the vicinity of the project, the testimony referenced above regarding the increase in fish population as a result of a greater food source would be applicable here. Marine productivity would not be adversely affected by this project and recreational values might well be increased because of the additional availability of boating slips in the area.

The project will be of a permanent nature.

There would be no adverse effect on or enhancement of any significant historic or archeological resources since none are present in the immediate area of the proposed construction.

Finally, the current condition and relative value of the functions being performed in the area affected by the proposed activity should not be changed. The immediate area is a residential area and the proposal for activity at the marina should in no way affect this.

Commercial activities will not be carried on except to the degree that is normally and generally associated with the operation of a private boat marina.

Taken together and evaluating all these criteria with a view toward establishing whether ornot the proposal is in the public interest or contrary thereto, it is clear that notwithstanding the fears and unhappiness of the residents of the apartments in the area, the lack of adverse effect on the public interest and the increase in some factors thereof results in a conclusion that the project is not contrary to the public interest and meets all criteria for granting the permit.

Even if there were some portions of the proposal that were contrary to the public interest, the compromise positions agreed to by the parties and included as conditions in the Revised Intent to Issue obviate any disqualification they might pose.

## RECOMMENDATION

Based on the foregoing Findings of Fact and Conclusions of Law, it is therefore:

RECOMMENDED that the Department of Environmental Regulation issue a dredge and fill permit to the applicant to construction an additional 50 slips at its north marina as proposed.

RECOMMENDED this 20th day of May, 1987, at Tallahassee, Florida.